Filed 9/17/13  P. v. Ortiz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALONSO RUBIO ORTIZ,<br><br>    Defendant and Appellant. | G047320<br><br>(Super. Ct. No. 11NF2566)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard F. Toohey, Judge.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Alonso Rubio Ortiz challenges the court's finding he was sane when he assaulted his brother with a knife.  We affirm.

FACTS

Jose Ortiz is defendant's older brother and is also a Marine trained in hand-to-hand combat.[1]  Prior to the incident in question, defendant had never physically attacked Jose.

On the night of the assault, defendant and Jose were in their home, along with Jose's wife (Asia) and two children.  Jose was lying in bed while Asia was in the kitchen.  Asia saw defendant open a kitchen drawer containing knives and other items, but did not see what he took out.  Defendant went to the computer area in the living room.  Asia heard a loud bang and saw defendant hitting the computer.  She screamed his name and told him to stop.

Jose "heard a lot of banging, like things were falling off the wall," so he came out of the bedroom.  As soon as Jose came out, he saw defendant walk from the living room into the hallway.  Jose heard Asia yell Jose's name.  Defendant was holding a knife.  Defendant walked quickly toward Jose.  Asia saw defendant lift up his hand.  Jose said, "Alonso, what are you doing?"  Defendant did not reply or display any emotion; he "was blank" like he was unaware of what was going on.

Defendant tried to thrust the knife at Jose.  Jose tried to take the knife away from defendant by pushing the knife to the side and restraining defendant's arm that carried the knife.  They fought; Jose pushed defendant into the living room.  They fell

---

[1]  To avoid confusion we refer to Jose Ortiz by his first name.  We mean no disrespect.

Our factual recitation is taken from the preliminary hearing transcript, which the trial court considered (with the parties' agreement) for the factual basis for the charge.

with defendant half on top of Jose. Jose's legs and arms were wrapped around defendant's arm that held the knife. Defendant picked Jose up several times and slammed him to the ground. As defendant slammed Jose to the floor, defendant said, "Let me go and I'll run away." Jose said, "Let go of the knife and I'll let you go." But defendant did not let go of the knife.

Jose got the knife away from defendant, but defendant regained control of it. Jose pushed defendant up against the couch. Defendant stabbed the knife into Jose's back two or three times. Jose regained control of the knife and tossed it away.

Jose told defendant to get up and leave. Defendant started running toward the door, but slipped and fell into a water dispenser. Jose kicked him in the chest. Defendant went outside and Jose told him to leave. Defendant left without saying anything. Jose sustained three cuts from the knife.

An information alleged defendant assaulted Jose with a knife. (Pen. Code, § 245, subd. (a)(1).)[2] Defendant pleaded guilty to the charge with the understanding that a determination of his sanity would follow. He waived his right to a jury trial.

At the court trial on the sanity phase, Dr. Veronica Thomas, a court-appointed psychologist, testified. Thomas had interviewed defendant for about one hour, and had reviewed the felony complaint, the preliminary hearing transcript, police reports, and the police interview of defendant. Thomas opined that, at the time of the assault, defendant suffered from paranoid schizophrenia and did not understand or realize it was wrong to assault his brother. Her opinion was based solely on her interview of defendant and his statements to her about what he was experiencing at the time of the crime. Thomas did not perform any tests on defendant to help determine whether he was schizophrenic. She did not phone defendant's treating psychiatrist or obtain any medical records from the psychiatrist, even though she knew the psychiatrist's name and phone

---

[2] All statutory references are to the Penal Code.

number and that defendant had signed a release enabling her to talk with the psychiatrist. Thomas never reviewed any of defendant's medical records.

Based on her interview of defendant, Thomas testified he had failed to take his prescribed psychiatric medications for some days before the assault, causing him to experience paranoia and discomfort for at least a day. He had the knife because he felt he had to protect himself. He watched videos on the computer monitor (including Norwegian Black Metal, which is fairly violent and aggressive), experienced pictures in the front of his head and in the back of his head, and hit the computer monitor to get it to stop communicating with him. He told Thomas that while he was running away from the scene he became aware that the person he had assaulted was his brother.

Thomas believed defendant was truthful in his interview with her, although she also believed his substance abuse history was probably more extensive than he had reported to her, but unrelated to the assault on Jose. She knew that defendant had entered a plea of not guilty by reason of insanity prior to his interview with her. She believed defendant was sane at the time of his police interview, which took place within a couple of hours of the incident itself.

After Thomas testified, defense counsel stated that Thomas's testimony was sufficient to constitute the entire defense case and elected not to call a second expert witness. The defense therefore rested.

The People introduced into evidence a CD and a transcript of a police investigator's interview of defendant. The court listened to the CD and read the transcript. In the interview, defendant stated he had just turned 21 years old and was disabled because he had been fired from his job and "did quite a few drugs" as a teenager. He stated he has been diagnosed with bipolar disorder and depression, and takes Risperdal and Ativan. He stated he had never been diagnosed with schizophrenia. He got in a knife fight with his brother because he (defendant) had been watching videos on the computer screen and "started hearing . . . or seeing things, having . . . a little bit of

4

delusions." It was like flashbacks of his dreams and it felt like people were hitting him and shooting at him. He was seeing things in the back of his head and at the same time in the front of his head. So he got really angry, pushed the computer screen, and was on his way to walk out. He grabbed a kitchen knife that he had in his pocket, because his brother started coming at him and looked pretty aggressive. His brother yelled at him. It got loud and freaked defendant out so he started hitting his brother in the stomach with the knife. Defendant saw blood on his brother's arm and knew he had injured his brother. At the time of his action, he knew it was wrong.

The court found defendant was sane at the time of the offense. The court stated: "Obviously he was in a fragile mental state, had some prior mental issues. Also it's clear he was a substantial abuser of drugs. . . . I was not persuaded by a preponderance of the evidence in relation to the testimony of Dr. Thomas." The court agreed with Thomas that defendant "certainly was sane at the time of the [police] interview shortly after the incident."

At the sentencing hearing, the court, having read and considered the Department of Correction and Rehabilitation's diagnostic study and recommendation report pursuant to section 1203.03 and the probation report, and finding this to be an unusual case, granted probation to defendant in the interest of justice. The court suspended imposition of sentence and placed defendant on three years of formal probation.

DISCUSSION

Defendant contends that Thomas's opinion was of such weight that the court could not have reasonably rejected it. He emphasizes Thomas's "professional expertise and her experience in speaking with, analyzing and evaluating" a thousand

5

individuals for insanity over the course of her career. He argues there was no contrary evidence presented that he was not psychotic at the time of the attack.

A defendant who pleads not guilty by reason of insanity bears the burden of proving he or she was incapable, at the time of the offense, of knowing or understanding the nature and quality of the act or of distinguishing right from wrong. (§ 25, subd. (b); *People v. Skinner* (1985) 39 Cal.3d 765, 769.) Because the defendant bears the burden of proof, "if neither party presents credible evidence on that issue the [fact finder] must find him sane." (*People v. Drew* (1978) 22 Cal.3d 333, 351, disapproved on another ground in *Skinner*, *supra*, 29 Cal.3d at p. 769.)

On appeal the substantial evidence standard of review applies to the trier of fact's finding on the sanity issue. (*People v. Belcher* (1969) 269 Cal.App.2d 215, 220.) An appellate court may not disturb the finding "'if there is any substantial and credible evidence in the record to support such finding.'" (*Ibid.*)

Because the issue in this appeal is whether the trial court could properly reject Thomas's opinion of defendant's insanity, we review the role of expert testimony on the issue. ""'"The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion . . . .""" (*People v. Coogler* (1969) 71 Cal.2d 153, 166.) Thus, the finder of fact is "not automatically required to render a verdict which conforms to the expert opinion" and may properly find the "defendant to be sane in the face of contrary unanimous expert opinion." (*People v. Drew*, *supra*, 22 Cal.3d at p. 350.) For example, the finder of fact may properly reject a psychiatrist's opinion (*Coogler*, at p. 167) "based upon the defendant's self-serving descriptions of his alleged past blackouts and lack of memory of the acts in question" (*id.* at p. 168) or upon the psychiatrist's relatively brief examination of the defendant (*Drew*, at pp. 350-351). The finder of fact may also properly reject an expert's opinion if the expert fails to explain the reasoning underlying the opinion. (*Id.* at p. 350.)

6

There are, of course, those cases in which the expert opinion is so overwhelmingly persuasive that a rejection of the opinion would be unreasonable. For example, in *People v. Duckett* (1984) 162 Cal.App.3d 1115, a divided court reversed and remanded the jury's finding of sanity. (*Id.* at p. 1118.) The defendant there had a "long history of chronic paranoid schizophrenia" (*id*. at p. 1121), including a prior five-year commitment to state mental hospitals (*id.* at p. 1118). Three psychiatrists testified that the defendant suffered from chronic paranoid schizophrenia and could not substantially appreciate the criminality of his conduct or conform his conduct to the requirements of the law. (*Id.* at pp. 1118-1119.) Two of the psychiatrists had interviewed the defendant many times over the course of at least five years. (*Ibid.*) A psychologist who had treated the defendant at a state mental hospital testified the defendant "could not function in society, unless he was heavily and continually medicated." (*Id.* at p. 1122.) Thus, the expert opinion was unanimous that the defendant was insane. (*Id.* at p. 1123.) Other witness testimony was likewise unanimous on the issue. (*Id.* at pp. 1120-1121.) The *Duckett* majority concluded that the evidence of the defendant's insanity "was of such weight and character that a jury could not reasonably reject it." (*Id.* at p. 1120.)

Here, substantial evidence supports the court's finding defendant was sane at the time he assaulted his brother with a deadly weapon. The court found Thomas's testimony to be unpersuasive. Thomas's reasoning and the material on which she based her opinion was not of such weight and character that the court could not reasonably reject it. Her opinion that defendant suffered from paranoid schizophrenia was based solely on her one-hour interview of him, lacked any supporting tests, and was contrary to his prior diagnosis of bipolar disorder and depression. Thomas never contacted defendant's psychiatrist for information on his psychological and substance abuse history. (§ 1027, subd. (b) [court-appointed expert must report on defendant's psychological and substance abuse history].) Thomas opined that defendant regained his sanity sometime within the brief time period between the assault and his interview by the

7

police.  But there was no evidence that defendant took any of his prescribed medications before the police interview.  That he was able to regain his sanity so quickly without any medication was inconsistent with Thomas's testimony that defendant had grown "increasingly paranoid over the day or two prior" to the assault because he had not taken his "psychiatric medicines."  Other evidence supported a finding defendant was aware of his surroundings at the time of the assault.  He told Jose that he (defendant) would leave if Jose would let go of him.  He ran out of the house after Jose disarmed him.  He told the police that he attacked Jose because Jose was aggressively coming at him and yelling.  In sum, substantial evidence supports the court's finding defendant was sane when he committed the crime.

DISPOSITION

The judgment is affirmed.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

8